# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :

                         v.          :          CRIMINAL NO. 24-14-02

ALAN KANE          :

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Alan Kane used his law license to help three clients commit federal crimes. First, he helped Joseph Ruggiero commit bankruptcy fraud as part of a broader scheme to steal a house from a dead man's estate. Second, Kane helped Ruggiero's son-in-law, Jonathan Barger, commit bankruptcy fraud in an attempt to evade a quarter-million-dollar debt. Finally, Kane helped Barger's company, Frankford Plating II, Inc., subsequently known as JB Frankford Plating, LLC ("Frankford Plating"), file a false claim in Ruggiero's bankruptcy proceeding.

Along the way, Kane repeatedly engaged in other outrageous conduct, which included:

- Telling Barger to "inflate" a bill for work done at the stolen house by more than $50,000;

- Filing a fraudulent mechanic's lien on behalf of Frankford Plating against Ruggiero, even though Ruggiero was Kane's own client;

- Fabricating a phony invoice to support Frankford Plating's fraudulent mechanic's lien;

- Filing a fraudulent amended mechanic's lien on behalf of Frankford Plating;

- Creating a second phony invoice to support the amended mechanic's lien;

- Filing a fraudulent counterclaim against the rightful owners of the stolen house;

- Lying to the Social Security Administration to help Ruggiero continue to collect benefits to which he was not entitled;

1

- Directing Barger to fabricate and backdate nine fraudulent purchase orders from Frankford Plating to Ruggiero;

- Advising Barger to hide his income from creditors by having Frankford Plating issue Barger's paychecks to Barger's wife;

- Counseling Barger to move his assets into his wife's name to hide them from creditors;

- Telling Barger not to pay property taxes due to the City of Philadelphia; and

- Advising Ruggiero and Barger to lie under oath to their respective bankruptcy trustees.

Additionally, on June 23, 2020, Kane lied to two FBI agents who were investigating these crimes. Specifically, after being shown the two phony invoices that Kane had fabricated to support Frankford Plating's fraudulent mechanic's liens, Kane told the FBI agents that the two invoices were actually copies of the same document and the only reason why they looked different from one another was because of a problem scanning the document the first time.

Analyzing all of this criminal conduct, the Presentence Investigation Report has correctly calculated that Kane's total offense level is 18 and his criminal history category is I, which means that his sentencing range under the United States Sentencing Guidelines is 27-33 months' imprisonment. The government, however, is seeking an upward variance for two reasons: (1) the PSR's fraud loss does not include the approximately $$277,464 of "intended loss" associated with Kane's role in Barger's bankruptcy filing; and (2) although the PSR does not give an aggravated role enhancement under Section 3B1.1 of the Guidelines, Kane clearly directed the criminal activities of all of his clients. For these reasons and the reasons detailed below, the government respectfully submits that a sentence of 51 months' imprisonment would best serve the sentencing factors set forth in 18 U.S.C. § 3553(a).

I.    **STATEMENT OF THE CASE**

    A.    **Procedural History**

On January 11, 2024, a federal grand jury sitting in the Eastern District of Pennsylvania returned a 12-count indictment against Jonathan Barger, Alan Kane, and Derrell Johnson. Kane was charged in Counts 1, 2, 3, and 7.

Count 1 alleged that Barger and Kane committed and aided and abetted the commission of bankruptcy fraud, in violation of 18 U.S.C. §§ 157 and 2. Count 2 alleged that Barger and Kane filed a false claim in bankruptcy, in violation of 18 U.S.C. § 152(4). Count 3 alleged that Kane made a false statement to the FBI, in violation of 18 U.S.C. § 1001. Count 7 alleged that Barger and Kane committed and aided and abetted the commission of bankruptcy fraud, in violation of 18 U.S.C. §§ 157 and 2.

On June 4, 2024, Barger pleaded guilty to the charges against him. Kane and Johnson proceeded to trial. On September 20, 2024, the jury convicted Kane and Johnson of all charges against them. Kane, specifically, was convicted on Counts 1, 2, 3, and 7.

    B.    **Offense Conduct**

        1.    **Background on the Loney Street Property**

In 1961, Evelyn Kraftsow obtained title to residential real estate located at 2324 Loney Street in Philadelphia (the "Loney Street Property"). In December 1973, Mrs. Kraftsow transferred title from herself individually to herself and her husband, Edward Kraftsow, as tenants-by-the entireties. Evelyn and Edward Kraftsow had one son, William Kraftsow. For many years, the Kraftsow family lived at the Loney Street Property.

On August 3, 1977, Edward Kraftsow died, and title to the Loney Street Property passed to Evelyn Kraftsow, who continued to live there. On January 1, 1997, Evelyn Kraftsow died, and title to the property passed to William Kraftsow, who continued to live there. On or about September 22, 2016, William Kraftsow died without leaving a will. William Kraftsow had no spouse, children, or siblings, but he had first cousins, and under Pennsylvania law, title to the Loney Street Property passed to those cousins when he died (the "Kraftsow family heirs").

One of William Kraftsow's cousins was Margery Bruck. Shortly after William Kraftsow died, Mrs. Bruck and her husband, Sanford Bruck, tried to settle the affairs of his estate. Among other things, the Brucks contacted the utility companies for the Loney Street Property, had the accounts changed to their names and address, and began paying the bills. Mr. and Mrs. Bruck also learned that William Kraftsow had fallen more than $20,000 behind on the property taxes he owed to the City of Philadelphia for the Loney Street Property. The Brucks hired a lawyer, Dan Rosin, who contacted City officials to delay a sheriff's sale of the property. The Brucks then began making plans to sell the Loney Street Property and use some of the proceeds to pay the property tax debt.

Before the Brucks could complete those plans, however, Ruggiero tried to steal the Loney Street Property through a title fraud scheme. Ruggiero was aided in his efforts by several people, including defendants Barger, Johnson, and Kane and men named Nathaniel Belton and Terrence Watson, who were referred to, respectively, as Persons A and B in the indictment.

### 2.    The Title Fraud Scheme

On May 23, 2017, Watson sent two emails to Johnson and attached to each email a draft of a fraudulent deed that purported to transfer ownership of the Loney Street Property from

Evelyn Kraftsow to Ruggiero in exchange for $90,000. The first draft of the fraudulent deed was backdated to November 23, 2009, which was still more than 12 years after Mrs. Kraftsow's death. The second draft was backdated to November 23, 2012, more than 15 years after Mrs. Kraftsow's death.

Two days later, Belton intentionally recorded a fraudulent deed at Philadelphia City Hall purporting to transfer ownership of the Loney Street Property from Evelyn Kraftsow to a fictitious person named "Antonio Rossi" on November 23, 2009, in exchange for $25,000. The fraudulent deed contained forged signatures of Mrs. Kraftsow and "Rossi," as well as a forged notary stamp and signature of a licensed notary, identified in the indictment as "P.G."

On June 9, Belton intentionally recorded a fraudulent deed that purported to transfer title to the Loney Street Property from "Rossi" to Ruggiero on June 7, 2017, in exchange for $15,000. This fraudulent deed contained forged signatures of "Rossi" and a notary identified in the indictment as "A.M.S-S." It also contained a forged notary stamp for A.M.S-S.

On the same day, June 9, 2017, Barger signed a check drawn on an account for Frankford Plating, which was made payable to Johnson in the amount of $5,518 for his participation in the title fraud scheme.

### 3. The Fraud Against the City of Philadelphia

By June 2017, the outstanding property tax debt owed for the Loney Street Property was approximately $27,964, and the City of Philadelphia had scheduled a sheriff's sale for July 2017. On June 28, 2017, Ruggiero, with the help of Barger, applied to the Philadelphia Department of Revenue for property tax relief through the City's Owner-Occupied Payment Agreement ("OOPA") program. This program allowed homeowners to restructure their property tax debts if

they could demonstrate that they resided in the property and met certain financial requirements. Ruggiero's OOPA application falsely represented that Ruggiero lived at the Loney Street Property and that Ruggiero had a net monthly household income of $1,200.

To support this fraudulent application, Ruggiero and Barger provided the City with numerous documents purporting to show that Ruggiero lived at the Loney Street Property. One of those documents was a phony Philadelphia Gas Works ("PGW") bill that appeared to be addressed to Ruggiero at the Loney Street Property. This bill, which was dated June 1, 2017, and covered the billing period of May 1 through 31, 2017, was created by Johnson, who altered an actual PGW bill that had been sent to him on the same date for the same billing period. Johnson also fabricated two earnings statements for Ruggiero from Frankford Plating.

On June 30, 2017, the Philadelphia Department of Revenue approved Ruggiero's OOPA application and entered into an agreement with Ruggiero, pursuant to which the City agreed to waive all interest and penalties on the outstanding property taxes owed on the Loney Street Property and further agreed that going forward, Ruggiero would have to pay only $54 a month toward his property tax debt. On the same day, June 30, 2017, Barger signed a check for $5,000 that was made payable to Johnson as a payment for Johnson's participation in the fraud scheme against the City.

### 4.      The Lawsuits over the Loney Street Property

In June 2017, Mr. and Mrs. Bruck learned that they were no longer listed on the utility bill accounts for the Loney Street Property. Further investigation led to the discovery of the fraudulent deeds, which purported to transfer ownership of the property from Mrs. Kraftsow to "Rossi" and then to Ruggiero. In August 2017, Mrs. Bruck, represented by attorney Rosin, filed

a lawsuit in the Philadelphia Court of Common Pleas against Ruggiero and "Rossi," seeking to void the fraudulent deeds.

Ruggiero reached out to Barger, who referred him to Kane, an attorney who had represented Barger in a 2013 bankruptcy filing. Kane reviewed Mrs. Bruck's lawsuit, which described the history of the property and attached copies of Evelyn Kraftsow's death certificate from 1997 and the two fraudulent deeds, purportedly signed by Mrs. Kraftsow many years after her death. On August 18, 2017, Kane contacted P.G., the notary whose stamp and signature appeared on the first fraudulent deed, and P.G. said that his stamp and signature had been forged. On September 6, 2017, P.G. sent a letter to Kane reiterating that he had not signed or notarized the fraudulent deed.

By this point, Kane knew that Ruggiero was not the lawful owner of the Loney Street Property. Kane, however, also had been told by Barger that Frankford Plating had provided Ruggiero with approximately $70,000 to $80,000 worth of labor and materials to help rehabilitate the Loney Street Property. Kane told Barger to "inflate" that number by more than $50,000 to account for Kane's anticipated legal fees. Kane then created a phony invoice from Frankford Plating to Ruggiero for $133,900 of "Property Renovation" work at the Loney Street Property. On December 29, 2017, Kane caused Frankford Plating to file a mechanic's lien action against Ruggiero and the Kraftsow family heirs, seeking reimbursement for the phony $133,000 bill. Although Barger signed the court filing, Kane did not explain to Barger that he was effectively suing his own father-in-law.

On February 13, 2018, Kane caused Frankford Plating to file an amended mechanic's lien, supported by a new version of the phony invoice for $133,900. The two phony invoices

differed from one another in at least three material ways: (a) whereas the first invoice included an Internet address for Frankford Plating, the second invoice did not; (b) whereas the second invoice contained a detailed description of the work allegedly performed by Frankford Plating at the Loney Street Property, the first invoice contained no such description; and (c) whereas the second invoice included a Frankford Plating logo, the first invoice did not.

On June 11, 2018, Kane caused Ruggiero and Frankford Plating to file a fraudulent counterclaim against all of the Kraftsow heirs for unjust enrichment. In this action, Kane asserted not only that Ruggiero was the rightful owner of the Loney Street Property, but also that he and Frankford Plating were owed $133,900 for rehabilitation work on the property. Kane also asserted fraud claims against P.G. and A.M.S-S., the two innocent notaries whose signatures and notary stamps had been forged on the fraudulent deeds.

In sum, by the summer of 2018, Kane was intentionally making false representations in two different lawsuits to the effect that: (a) Ruggiero was the legitimate owner of the Loney Street Property, having purchased it from "Rossi," and (b) Frankford Plating was owed approximately $133,900 for labor and materials provided to rehabilitate the property. In some instances, Kane made these representations on behalf of Ruggiero, and in others, Kane made these representations on behalf of Frankford Plating against Ruggiero.

### 5.    Kane's Representations to the Social Security Administration

Contemporaneously, Kane was also representing to the Social Security Administration ("SSA") that Ruggiero was not the legitimate owner of the Loney Street Property in order to help Ruggiero maintain his eligibility for Supplemental Security Income ("SSI") benefits. Under the SSI program, the SSA provided monthly payments to adults who were 65 or older or to people

with disabilities who had limited incomes and financial resources. Ruggiero had first applied for, and began receiving, SSI benefits in 2009.

On or about June 14, 2018, the SSA sent a letter to Ruggiero stating that since Ruggiero owned the Loney Street Property, he was no longer eligible for SSI benefits. The letter also stated that since Ruggiero had obtained title to the Loney Street Property in June 2017, the SSA had overpaid Ruggiero by more than $3,600, and Ruggiero would have to repay that money to the SSA.

On September 26, 2018, Kane wrote a letter to the SSA, stating that Ruggiero had hired Kane to represent him in seeking reconsideration of the SSA's decisions. On October 26, 2018, Kane wrote a letter to the SSA, which stated that Ruggiero did not actually own the Loney Street Property so: (a) there had been no overpayment of SSI benefits to Ruggiero; (b) Ruggiero should not have to repay any money to the SSA; and (c) Ruggiero should continue to receive monthly SSI benefits from SSA. In support of these claims, Kane provided the SSA with a copy of the lawsuit that Mrs. Bruck had filed against Ruggiero. Kane even sent the SSA a statement by Ruggiero admitting that he did not have a valid legal interest in the Loney Street Property because the deed that he had obtained from "Rossi" was invalid because "Rossi" had not been the true owner of the property since Evelyn Kraftsow had died in 1997.

In other words, Kane was making representations about Ruggiero's ownership of the Loney Street Property to the SSA that were diametrically opposed to the representations that Kane was making on Ruggiero's behalf in the Philadelphia Court of Common Pleas. On November 15, 2018, the SSA sent a letter to Ruggiero stating that, based on the information and

supporting evidence that Kane and Ruggiero had provided to the SSA, Ruggiero's request for

reconsideration had been approved.

### 6.    Ruggiero's Fraudulent Bankruptcy Petition

By early 2019, Ruggiero and Frankford Plating were on the verge of losing both lawsuits

in the Philadelphia Court of Common Pleas to the Kraftsow family heirs. On March 6, 2019, the

day before a scheduled sanctions hearing, Kane filed a bankruptcy petition on behalf of Ruggiero

in the United States Bankruptcy Court for the Eastern District of Pennsylvania. The filing of this

bankruptcy petition caused an automatic stay of all legal claims against Ruggiero, including the

lawsuit from Mrs. Bruck on behalf of herself and all of the Kraftsow family heirs.

Ruggiero made numerous false representations in support of his bankruptcy petition, and

Kane certified that he had "no knowledge after an inquiry" that any of Ruggiero's

representations had been false. For example, on one of his bankruptcy schedules, approved by

Kane, Ruggiero falsely identified Frankford Plating as a secured creditor with a claim of

$159,000. Additionally, at a bankruptcy hearing on September 12, 2019, with Kane by his side,

Ruggiero testified that he was the legitimate owner of the Loney Street Property, even though

Ruggiero and Kane had told the SSA eleven months earlier that Ruggiero did not own the Loney

Street Property.

Then, on December 27, 2019, Barger, with Kane's help, caused Frankford Plating to file

a secured proof of claim against Ruggiero's bankruptcy estate for approximately $146,292.

Barger signed the proof of claim as president of Frankford Plating. Barger and Kane supported

this proof of claim by filing a copy of the fraudulent invoice from Frankford Plating to Ruggiero

for $133,900. To further support this bogus claim, Kane directed Barger to fabricate a series of

phony "purchase orders" from Frankford Plating to "Joe" for the "Loney St. Rehab" and to backdate these "purchase orders" to the summer of 2017.

### 7.    Barger's Fraudulent Bankruptcy Filings

At the same time that Kane was helping Ruggiero file a fraudulent bankruptcy petition, Kane was also directing Barger to file a fraudulent bankruptcy petition. Kane had actually counseled Barger to file three different bankruptcy petitions—in 2013, 2018, and 2019—in a yearslong effort to avoid Barger having to pay the mortgage or property taxes due for the building located at 2505 Orthodox Street in Philadelphia, Pennsylvania, which housed Frankford Plating (subsequently known as JB Frankford Plating)..

After the 2013 bankruptcy, Barger's personal credit rating was destroyed, but he was still a target for creditors. Kane advised Barger to transfer most of his assets into his wife's name. These assets included the Barger family's house and primary bank account. Kane also told Barger to hide his own income from creditors by writing the checks from Frankford Plating for his salary to his wife; that way, it would appear that Barger was not generating much personal income. Barger followed Kane's advice and signed hundreds of checks drawn on Frankford Plating bank accounts that were made payable to his wife even though they were for his work at the company. Barger's wife then deposited these checks into bank accounts that she controlled. In 2018 alone, Barger signed Frankford Plating checks made payable to this wife, which had a total value of more than $520,000 – all upon the advice of Kane.

As of 2017, the mortgage holder on the Orthodox Street property was Syndcore Holdings, LLC ("Syndcore"). In May 2017, Syndcore filed a foreclosure action on the property, and a sheriff's sale was scheduled for July 2018. On July 17, 2018, Barger, represented by Kane,

11

filed a Chapter 13 bankruptcy petition in a case that was docketed as Bankruptcy Case No. 18-
14725. By filing this petition, Barger and Kane were able to forestall the sheriff's sale. In support
of this petition, Barger, advised by Kane, filed multiple bankruptcy schedules. In several
schedules, Barger hid income that his wife had received from Frankford Plating. Attorney Kane
signed the bankruptcy petition and certified that he had "no knowledge after an inquiry that the
information in the schedules filed with the petition is incorrect."

On December 12, 2018, the Bankruptcy Court dismissed Barger's petition. *Id.* ¶ 22.
Shortly thereafter, Syndcore rescheduled the sheriff's sale for 2505 Orthodox Street to January
16, 2019. On January 15, 2019, Barger, represented by Kane, filed a third bankruptcy petition,
which was docketed at Case No. 19-10254. In support of this petition, Barger again filed
bankruptcy schedules that contained representations that Barger knew were false. Kane
electronically signed the bankruptcy petition and certified that he had "no knowledge after an
inquiry that the information in the schedules filed with the petition is incorrect." Both Barger and
Kane knew that the schedules contained false and misleading information about the value of
Frankford Plating and Barger's wife's income.

On one schedule, Barger listed Syndcore as an unsecured creditor with a claim for
$254,231. On March 15, 2019, the trustee reviewing Barger's bankruptcy petition held a Section
341 Hearing. Kane represented Barger hearing. During the hearing, and after Barger was placed
under oath, the trustee directly asked Barger whether his wife was employed. Barger, who was
under oath, responded, "Well she's self-employed. She does cosmetic sales." Kane then
interjected, "I believe she only makes a couple thousand dollars a year, is it?" Barger answered,
"Yes." Both Barger and Kane knew that those representations were lies.

12

### 8.   Kane's False Statements to the FBI

On June 23, 2020, FBI agents interviewed Kane at his office, and Kane lied to them. Specifically, when the agents showed Kane copies of the two invoices that he had attached as exhibits to Frankford Plating's mechanic's lien filings, Kane told the agents that the two invoices were copies of the same document. Kane said that the reason why the invoices looked different was because of a problem scanning the document the first time. Kane made these statements even though he knew that: (a) the invoices were not the same; and (b) Kane had fabricated both of them to support Frankford Plating's fraudulent claim for a mechanic's lien. At the end of the interview, the FBI agents handed Kane a grand jury target letter.

### 9.   The Mortgage Sale of the Loney Street Property

In March 2021, Ruggiero's bankruptcy trustee sold the Loney Street Property. Gross proceeds from the sale were $266,000. The trustee then made a total of $105,927.89 in disbursements from those proceeds for expenses that included a commission to the real estate broker ($15,300), inheritance taxes ($38,250), back taxes owed to the City of Philadelphia ($46,252.54), and other costs and fees. The payment of these expenses left $160,072.11 in the estate. The trustee disbursed $31,582 of those proceeds to himself and his law firm and sent $212.98 to Atlas Acquisitions, LLC, which had asserted a claim against Ruggiero. The trustee sent the remaining funds – $128,277 – to Margery Bruck as administratrix of the Kraftsow estate, and she used all of this money to pay the lawyers who represented the estate against Kane and his clients.

But for the defendant's crimes, the Kraftsow heirs would have been able to keep approximately $160,072.11.

### 10.     Intended and Actual Loss Related to Count 7 Conviction

The primary goal of the bankruptcy fraud described in Count 7 of the indictment and proven at trial was to help Barger evade his debt to Syndcore, as the mortgage holder on the building that housed Frankford Plating. According to the schedules filed by Barger and Kane, Syndcore's claim against Barger's bankruptcy estate was for $254,231.

A secondary goal of this bankruptcy fraud scheme was to reduce Barger's debt to the City of Philadelphia for property taxes owed on Frankford Plating's building. Kane concocted a claim that the building was located on land that had been contaminated by hazardous waste caused by the business, so it was worth only $20,000. To support this theory, when Kane identified Barger's creditors on his bankruptcy schedules, he indicated that Barger owed a total of $43,233 to the City, but only $20,000 was secured by the building as collateral, and the other $23,233 was unsecured. *See* Exhs. 154-155. Kane also told Barger not to pay any of his property tax debt to the City, even though Barger had already worked out a payment plan for those taxes.

In total, therefore, Kane tried to help Barger fraudulently evade $277,464 in debts with his 2019 bankruptcy petition – the $254,231 debt to Syndcore plus $23,233 of Barger's property tax debt to the City. This figure represents the intended loss associated with the bankruptcy fraud in Count 7.

Neither Syndcore nor the City suffered any actual losses as a result of this bankruptcy fraud. The bankruptcy trustee ultimately dismissed Barger's petition without discharging Barger's debts to any of his creditors. Barger has since paid all of his property taxes to the City, and at some point since the trial, another lender purchased Syndcore's claim against Barger, which means that Syndcore has been made whole.

## II.    SENTENCING CALCULATION

### A.    Statutory Maximum Sentence

Kane is facing the following total statutory maximum sentences: Counts 1 and 7 (bankruptcy fraud), 5 years' imprisonment, a 3-year period of supervised release, a $250,000 fine, and a $100 special assessment, on each count; Count 2 (filing a false claim in bankruptcy), 5 years' imprisonment, a 3-year period of supervised release, a $250,000 fine, and a $100 special assessment; and Count 3 (false statement to the FBI) 5 years' imprisonment, a 3-year period of supervised release, a $250,000 fine, and a $100 special assessment.

In total, therefore, Kane is facing a maximum possible sentence of 20 years' imprisonment, 3 years of supervised release, a $1 million fine, and a $400 special assessment. Full restitution must also be ordered.

### B.    Guidelines Calculation

The government agrees with the PSR's guidelines calculations. Under Section 3D1.2(d), Counts 1, 2, 3, and 7 should be grouped together because the offense level for each is determined largely on the total amount of harm or loss. The applicable guideline for bankruptcy fraud offenses is U.S.S.G. § 2B1.1, and the base offense level for an offense that does not carry a maximum penalty of 20 years' imprisonment is 6, pursuant to U.S.S.G. § 2B1.1(a)(2). The actual loss to the Kraftsow estate is approximately $160,072,[1] and under Section 2B1.1(b)(1)(F), a loss

---

[1] Kane objects to this finding. Primarily, he contends that the only loss amount attributable to his bankruptcy crimes is the $31,582 that was paid to bankruptcy trustee and his law firm. The roughly $128,000 that the Kraftsow estate spent on lawyer was, according to Kane, attributable to the litigation costs stemming from the Court of Common Pleas filings. There is no evidence to support Kane's assertion, and even if there were, it would be irrelevant.

of more than $150,000 but not more than $250,000 results in a 10-level upward adjustment, which brings Kane's offense level to 16. Another two levels should be added, pursuant to U.S.S.G. § 2b1.1(b)(9)(B), because the offenses involved bankruptcy fraud, which would bring Kane's offense level to 18. Kane also abused a position of private trust and used a special skill in a manner that significantly facilitated the commission and concealment of his crimes, which should add two offense levels to 20, pursuant to U.S.S.G. § 3B1.3.

The PSR has concluded that Kane is eligible for a two-level downward adjustment under Section 4C1.1 because he meets the criteria of a zero-point offender. The government had objected to this finding on the grounds that Kane should receive an aggravated role enhancement under Section 3B1.1(c) because he directed Ruggiero, Barger, and Frankford Plating to commit all of the bankruptcy crimes charged in Counts 1, 2, and 7, and Section 4C1.1 does not apply to defendants who receive adjustments under Section 3B1.1. The Probation Department disagreed with the government's argument, but observed that "the U.S. Sentencing Commission has noted that an upward departure may be warranted in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization." PSR at 26-27.

The government accepts the PSR's conclusion that Kane's conduct does not merit an aggravated role enhancement under Section 3B1.1. Accordingly, the government also relinquishes its objection to the two-level downward adjustment under Section 4C1.1. However,

---

As alleged in Count 1 and proven at trial, Kane committed bankruptcy fraud as part of a larger scheme to help Ruggiero steal the Loney Street Property from the Kraftsow family heirs and to help Barger and Frankford Plating assert false claims against the estate. Kane, therefore, is responsible for all losses incurred by the Kraftsow estate as a result of the overarching fraud scheme. Those losses approximate $160,072.

as explained below, the government believes an upward variance based on Kane's role in the bankruptcy crimes would be appropriate here.

Based upon this analysis, Kane's total offense level should be 18. With a criminal history category of I, Kane's range under the guidelines is 27 to 33 months' imprisonment.

## III.    <u>ANALYSIS</u>

### A.    <u>The Analytical Framework</u>

The Third Circuit has set forth a three-step process which the district courts must follow in compliance with the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220 (2005):

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.

> (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force.

> (3) Finally, they are to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless of whether it varies from the sentence calculated under the Guidelines.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and citations omitted), *cited favorably in United States v. Friedman*, 2011 WL 4470674, at *14 (3d Cir. Sept. 28, 2011); *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006). In calculating the guideline range, this Court must make findings pertinent to the guideline calculation by applying the preponderance of the evidence standard, in the same fashion as was employed prior to the *Booker* decision. *United States v. Grier*, 475 F.3d 556 (3d Cir. 2007) (*en banc*).

At the third step of the sentencing process, the Court must consider the advisory guideline range along with all the pertinent considerations of sentencing outlined in 18 U.S.C. § 3553(a) in determining the final sentence. "The record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *Cooper*, 437 F.3d at 329; *see also Rita v. United States*, 127 S. Ct. 2456, 2468 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."); *United States v. Schweitzer*, 454 F.3d 197, 205-06 (3d Cir. 2006).

**B.    An Upward Variance Is Appropriate Here**

As indicated above, the defendant's properly calculated advisory sentencing range under the current guidelines is 27 to 33 months' imprisonment. An upward variance from that range would be appropriate for two reasons: (1) the Guidelines calculation of the fraud loss arising from Kane's crimes fails to take into account the intended loss associated with Barger's fraudulent bankruptcy filing (Count 7); and (2) the Guidelines fail to adequately take into account Kane's leadership role in committing all of the bankruptcy crimes in Counts 1, 2, and 7.

**1.    Kane's Sentence Should Include Consideration of Intended Loss**

In *United States v. Banks*, 55 F.4th 246 (3d Cir. 2022), the Third Circuit held that the commentary to USSG § 2B1.1 that includes "intended loss" in the calculation of loss under that guideline is invalid, as it conflicts with the unambiguous reference in the guideline text to "loss." The Sentencing Commission abrogated this determination effective November 1, 2024, by

18

including intended loss in the definition of loss in the guideline text. The amended text repeats the rule that previously applied in an application note: "Loss is the greater of actual loss or intended loss."

The *Banks* ruling applies to offenses completed before November 1, 2024. Here, the intended loss includes both the actual loss suffered by the Kraftsow estate ($160,072), plus the amount of Barger's debt to Syndcore and the City that the bankruptcy fraud in Count 7 sought to evade ($277,464). **The total of that intended loss is $437,536**. Accordingly, this Court should grant a 2-level upward variance in order to apply the guideline range that is produced by using the full intended loss as the pertinent "loss" under Section 2B1.1, that is, a 12-level upward adjustment, pursuant to U.S.S.G. § 2B1.1(b)(1)(G), based on a loss of more than $250,000, but not more than $550,000. That is because the result produced by the *Banks* decision is entirely divorced from the purposes of sentencing, and from the clear and sensible view of the Sentencing Commission regarding the appropriate way to measure harm in fraud cases, that has remained unchanged for 35 years.

Consideration of intended loss is essential in measuring culpability. A person who attempts to steal $5 by making a false statement is plainly less culpable, and less worthy of incapacitation and punishment, than some who tries to steal $1 million through a false statement, and no sensible sentencing authority would suggest they should be treated the same just because both were caught before they could enjoy the fruit of their efforts.[2] Thus, since the very inception of the Guidelines, the Commission, without objection by Congress, has called for

---

[2]    It would likewise be irrational to fully punish the person who steals $1 million, while letting off entirely the person who attempts exactly the same theft but is caught a moment before possible success.

assessment of intended as well as actual loss.

The very first iteration of the fraud guideline, § 2F1.1, effective November 1, 1987, called in its text for assessment of "estimated, probable, or intended loss." At the same time, the theft guideline, § 2B1.1, referred to the "value of the property taken." The Commission soon reconciled these provisions. In Amendment 7 (June 15, 1988), the Commission changed the text of the theft guideline to refer to "loss," and added an application note stating, "In cases of partially completed conduct, the loss is to be determined in accordance with the provisions of §2X1.1 (Attempt, Solicitation, or Conspiracy Not Covered by a Specific Guideline)." At the same time, in Amendment 30 (June 15, 1988), the Commission likewise amended the text of § 2F1.1 to refer only to "loss," and amended the application notes to § 2F1.1 to provide: "Valuation of loss is discussed in the Commentary to §2B1.1 (Larceny, Embezzlement, and Other Forms of Theft)."

In subsequent amendments, such as Amendment 393 (Nov. 1, 1991), the Commission consistently repeated and clarified the direction to include intended loss in the determinations regarding §§ 2B1.1 and 2F1.1, ultimately merging those provisions into the current § 2B1.1 addressing all theft and fraud offenses. The current iteration of the definition of "loss" stems from Amendment 617 (Nov. 1, 2001), in which the Commission resolved circuit conflicts over prior definitions of "loss" while "retain[ing] the core rule that loss is the greater of actual and intended loss." *Id*. The Commission stated that it did so because in "cases in which intended loss is greater than actual loss, the intended loss is a more appropriate initial measure of the culpability of the offender." *Id.*

Notably, every one of those changes was submitted to Congress to allow an opportunity

for disapproval. *See, e.g.*, Sentencing Guidelines for United States Courts, 53 Fed. Reg. 15530-01, 1988 WL 271139 (Apr. 29, 1988) (regarding Amendments 7 and 30); Amendments to the Sentencing Guidelines for United States Courts, 56 Fed. Reg. 22762-01, 1991 WL 306198 (May 16, 1991) (regarding Amendment 393); Sentencing Guidelines for United States Courts, 66 Fed. Reg. 30512-01 (June 6, 2001) (regarding Amendment 617).

That is consistent with the Commission's approach to all commentary. At the very outset, in the Sentencing Reform Act, Congress required district courts to consider "the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission" in imposing a sentence. 18 U.S.C. § 3553(b)(1). Congress further provided, in 28 U.S.C. § 994(x), that to promulgate or amend a guideline, the Commission must comply with the notice-and-comment procedures for rulemaking by executive agencies. *See* 5 U.S.C. § 553(b) and (c). And under 28 U.S.C. § 994(p), the Commission must "submit to Congress" any proposed amendment to the Guidelines, along with "a statement of the reasons therefor." Proposed amendments generally may not take effect until 180 days after the Commission submits them to Congress. *Id.* Although Sections 994(p) and (x) do not apply to policy statements and commentary, the Commission's rules provide that "the Commission shall endeavor to include amendments to policy statements and commentary in any submission of guideline amendments to Congress." U.S. Sentencing Comm'n R. 4.1. And indeed, the Commission has submitted for Congress' review every pertinent amendment to the fraud guideline regarding loss.

In this light, it is apparent that the decision in *Banks* has nothing whatsoever to do with the propriety or sensibility of considering intended loss when imposing a sentence for fraud. *Banks* instead rests on principles of administrative law, and the ruling in *Kisor v. Wilkie*, 588

21

U.S. 558 (2019), that an administrative agency's interpretation of a regulation may not expand the scope of an otherwise unambiguous regulation. It is apparent that this notion, developed in the review of actions of other administrative agencies, is an exceptionally poor fit in the application of the Guidelines. The Sentencing Guidelines, from their very inception, were conceived as a single body of text in which guideline directives are amplified by explanatory commentary, and all portions are subject to rejection by Congress.

Most notably, the holding of *Banks* that the application note regarding intended loss is not binding does not restrict in any way this Court's power to consider that commentary in reaching a discretionary judgment regarding the final sentence. The *Banks* Court explicitly recognized this principle, stating, "Our holding should not be read as imposing any restriction on a district court's discretion to vary a sentence when appropriate." *United States v. Banks*, 55 F.4th 246, 258 n. 58 (3d Cir. 2022).

At the end of the day, the Sentencing Commission remains the expert agency established for the purpose of promoting consistency in sentencing, by examining sentencing practices nationwide and suggesting sentencing ranges for specific offenses. *See generally Peugh v. United States*, 569 U.S. 530, 535-37 (2013). And with regard to intended loss, it has always called for assessment of that fact, a determination that comports with sentencing courts' historic views and, as stated above, with basic common sense. The Commission maintained a consistent view for 35 years, and then when *Banks* undermined that approach, acted instantly to abrogate *Banks*.

Thus, while *Banks* directs this Court to consider only actual loss when calculating the guideline range in cases predating the recent amendment, for the sole reason that under the

previous structure of the Guidelines "intended loss" is mentioned in an application note instead of the guideline itself, the decision does not limit in any way this Court's authority at the final stage of the sentencing assessment to consider all pertinent information, including the consistent and entirely appropriate view of the Sentencing Commission that a greater intended loss warrants greater punishment. For these reasons, the Court should grant a two-level upward variance to Kane's offense level.

### 2.     Kane Directed All of the Bankruptcy Crimes in this Case

As the final PSR notes, the sentencing commission has recognized that an upward departure may be warranted for a defendant who exercises "management responsibility" over the activities of a criminal organization. That is precisely what Kane did here. He was convicted on Counts 1, 2, 3, and 7.

With regard to Count 1, the bankruptcy fraud arising from Ruggiero's bankruptcy filings, there were three participants in the crime: Kane, Barger, and Ruggiero, the latter of whom was not charged because he is dead. With regard to Count 2, Frankford Plating's filing of a false claim in bankruptcy, there were two participants: Kane and Barger. With regard to Count 7, the bankruptcy fraud arising from Barger's bankruptcy filings, there were two participants: Kane and Barger.

In all three cases, Kane exercised leadership and managerial responsibility over the bankruptcy crimes. Indeed, none of these bankruptcy crimes would have been committed but for Kane's actions, which included directing Ruggiero and Barger to file their respective fraudulent bankruptcy petitions, completing and filing all of the fraudulent bankruptcy forms and schedules, directing Barger to inflate Frankford Plating's claim for work done on the Loney Street Property,

directing Barger to fabricate and backdate phony purchase orders to Ruggiero for work done on the property, and coaching Ruggiero and Barger to mislead the bankruptcy trustees at their respective Section 341 hearings.

Thus, although the government accepts the PSR's finding that Kane does not merit an aggravated role enhancement under Section 3B1.1(c), we respectfully submit that a two-level upward variance would be appropriate here, given Kane's unique role as the person overseeing and directing the bankruptcy crimes of his co-conspirators Ruggiero and Barger.

### 3.    Synthesis of the Upward Variances and Application of Section 3553(a)

In total, the government is seeking two upward variances, which would have the effect of increasing Kane's sentencing range by four offense levels: two based on intended loss and two based on his role in the offense. If the Court agrees that these variances are appropriate, Kane would be sentenced as if his total offense level were 22 and his sentencing range under the guidelines would be 41-51 months' imprisonment.

The government respectfully submits that a sentence at the top of that range – i.e., 51 months' imprisonment -- would best serve the sentencing factors set forth in 18 U.S.C. § 3553(a). Those factors include (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to

avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).[3]

Sections 3553(a)(4) and (a)(5) specifically direct the Court to consider the applicable guidelines and commentary, and Section 3553(a)(6) commands that the Court strive to avoid disparity in sentencing among similarly situated defendants. Collectively, therefore, they counsel for the imposition of a within-Guidelines sentence of 27 to 33 months' imprisonment. The nature and circumstances of the defendant's offenses, and Kane's particular history and characteristics support the imposition of a sentence substantially above that range: i.e., 51 months' imprisonment.

The nature of the offenses in this case were very serious. Kane used his law license to help his clients try to steal a house. He repeatedly advised Ruggiero, Barger, and Frankford Plating to make false and fraudulent claims in the Court of Common Pleas, to the Social Security Administration, and in the United States Bankruptcy Court. Kane personally fabricated the two phony "invoices" from Frankford Plating to Ruggiero that he attached to the mechanic's lien actions, and he told Barger to fabricate and backdate weekly "purchase orders" from Frankford

---

[3]  Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not greater than necessary" language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'" *United States v. Dragon*, 471 F.3d 501, 506 (3d Cir. 2006) (quoting *United States v. Navedo-Concepcion*, 450 F.3d 54, 58 (1st Cir. 2006)).

Plating to Ruggiero. Kane also asserted frivolous fraud claims against people whom he knew were innocent, such as the notaries P.G. and A.M.S-S, whose signatures and notary stamps had been forged on the fraudulent deeds for the Loney Street Property. Kane even asserted multiple claims on behalf of one of his clients, Frankford Plating, against another of his clients, Ruggiero, without telling either Barger or Ruggiero what he was doing.

Kane's "history and characteristics" also warrant a 51-month sentence, as this is not the only case in which Kane has engaged in gross misconduct as an attorney. On March 8, 2023, the Pennsylvania Supreme Court suspended Kane from the practice of law in Pennsylvania for a period of one year and one day, based upon findings by the Court's Disciplinary Board that Kane violated ten separate Pennsylvania Rules of Professional Conduct during his representation of a woman in a legal action against her former employer.[4] According to the Disciplinary Board's report, which the Supreme Court accepted, Kane violated Rules of Professional Conduct 1.2(a), 1.4(b), 1.6(a), 1.6(d), 1.6(e), 1.7(a)(2), 1.16(d), 3.1, 8.4(a), and 8.4(c), and his actions in the course of representing that client "were motivated by his own self-interest in maximizing the attorney's fee, rather than on achieving the best result for his client." *See* Exhibit 1 at 21. Among other things, the Board found that Kane repeatedly misled and confused his client about their fee arrangement in an attempt to renegotiate its terms; "filed a frivolous civil complaint against his client" in an attempt to collect excessive attorney's fees from her; breached his duty of confidentiality to the client by "gratuitously and unnecessarily" revealing confidential, personal

---

[4] A copy of the Pennsylvania Supreme Court's suspension order, along with the Report and Recommendations of the Disciplinary Board of the Supreme Court, are attached as Exhibit 1 to this Sentencing Memorandum

information about his client in the frivolous complaint that he filed; and engaged in "conduct involving dishonesty, fraud, deceit, and misrepresentation." *Id.*

A sentence of 51 months' imprisonment range would also promote respect for the law and provide just punishment for Kane's crimes. Such a sentence also would serve the sentencing goal of general deterrence. It would send a message to other lawyers in Kane's position that severe consequences await them if they abuse the privilege of being attorneys and use their law licenses to commit crimes and help their clients commit crimes.

The sentencing goal of providing Kane with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner, U.S.S.G. § 3553(a)(2)(D), is not applicable in this case.

**IV.**    <u>**CONCLUSION**</u>

For all the foregoing reasons, the government respectfully requests that this Court sentence Kane to a sentence of 51 months' imprisonment. Additionally, the government asks this Court to order Kane to pay a within-Guideline fine and full restitution to the Kraftsow estate as a condition of a 3-year term of supervised release.

Respectfully submitted,
DAVID METCALF
United States Attorney


*/s/ Mark B. Dubnoff*
MARK B. DUBNOFF
Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Government's

Sentencing Memorandum was served by email upon Paul Hetznecker, counsel for the defendant.


Date: April 23, 2025                         */s/ Mark B. Dubnoff*
                                             MARK B. DUBNOFF